**GREGORY PERKINS,**

        **Plaintiff,**

v.                                                    Case No. 22-CV-1125

**JAMES KOHLER,** *et al.***,**

        **Defendants.**

## DECISION AND ORDER

      Plaintiff Gregory Perkins, who is representing himself and confined at Green Bay Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Perkins was allowed to proceed on a claim under the First Amendment against defendants James Kohehler, Daniel Cushing, and John Kind because they allegedly retaliated against him for filing a complaint under the Prison Rape Elimination Act (PREA). Perkins was also allowed to proceed on a claim under the Eighth Amendment against Cushing for cruel and unusual punishment because Cushing allegedly verbally harassed Perkins about his sexuality. The defendants filed a motion for summary judgment. (ECF No. 48.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 3, 18.)

### PRELIMINARY MATTERS

      The defendants argue that Perkins failed to follow Federal Rule Civil Procedure 56 and Civil Local Rule 56 when responding to their motion for summary judgment by

not responding to the defendants' proposed findings of fact. They argue that the court should deem all of the defendants' facts as undisputed and grant summary judgment in their favor. (ECF No. 72 at 2.)

District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in the light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While Perkins's response materials do not formally conform with the rules, his response contains sufficient facts to allow the court to rule on the defendants' summary judgment motion. The court notes that Perkins submitted his own proposed findings of fact (ECF No. 62), and in his response brief he directly responds to several of the defendants' proposed facts, citing exhibits and other documents in the record. (ECF No. 61.) Additionally, Perkins filed responses to all the declarations submitted by the defendants as well as submitted his own declarations and affidavits. (ECF Nos. 63-71.)

Perkins also filed a response to the defendants' reply brief, which the court will construe as a surreply. While he did not move to file a surreply, "[t]he decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Merax-Camacho v. U.S.*, 417 F. App'x 558, 559 (7th Cir. 2011) (citing *Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3 626, 631 n. 2 (7th Cir. 2010)). "In some instances, allowing a filing of a surreply 'vouchsafes the aggrieved party's right to be heard and provides the court with the information necessary to make an informed

2

decision.'" *Univ. Healthsystem Consortium v. United Health Group, Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014) (quoting *In re Sulfuric Acid Antitrust Litg.*, 231 F.R.D. 320, 329 (N.D. Ill. 2005)).

Because Perkins is representing himself, allowing a surreply, which was promptly filed after the defendants' filed their reply, gives the court the ability to see the full picture when deciding the summary judgment motion. The court notes that Perkins's surreply also is substantially similar to his original response materials. If the defendants objected to the surreply, they had ample time to file a motion to strike it. They did not. As such, the court will consider the information contained in Perkins's surreply where appropriate in deciding the defendants' motion for summary judgment.

## FACTS

*Parties*

Perkins was incarcerated at Oshkosh Correctional Institution from April 27, 2021, through November 1, 2021. (ECF No. 50, ¶ 2.) On November 1, 2021, he was transferred to Fox Lake Correctional Institution, where he stayed until January 12, 2022, when he was transferred to Green Bay Correctional Institution (GBCI). (*Id.*) He is currently incarcerated at GBCI. (*Id.*, ¶ 1.)

At all times relevant Koehler was the Corrections Program Supervisor at GBCI. (ECF No. 50, ¶ 3.) Cushing was a Captain at GBCI and Kind was the GBCI Security Director. (*Id.*, ¶¶ 4-5.)

*Placement of the Special Handling Note*

It is undisputed that, while incarcerated at Oshkosh, on July 22, 2021, Perkins called the PREA hotline to report a PREA violation involving another prisoner, Timothy Behrensprung, and his report became part of a PREA investigation. (ECF No. 50, ¶¶ 34-35.) The defendants assert that the PREA investigation concluded on October 11, 2021, while Perkins was still at Oshkosh. (*Id.*, ¶ 36.) Perkins alleges that the PREA investigation continued after he was transferred to GBCI because non-defendant Todd Kazik, who was part of GBCI's security staff, was reviewing his emails and sending them to GBCI security staff, including the defendants. (ECF No. 61 at 2.) The defendants admit that, because of their positions in security, Kind and Cushing were aware of the PREA investigation at Oshkosh, but they maintain Koehler was unaware of the investigation. (ECF No. 50, ¶¶ 37-38.) Regardless, the defendants state they did not participate in the PREA investigation and had no reason to follow-up or reopen the investigation once Perkins was transferred to GBCI. (*Id.*, ¶¶ 39-40.)

On February 5, 2022, Kazik (who was apparently reviewing emails for a reason that is not clear in the record) sent Koehler and other non-defendants an email entitled, "Do Not House Together," informing them that, based on their emails, it appeared that Perkins and Behrensprung started a romantic relationship at Oshkosh and were trying to continue it now that they were both at GBCI. (ECF No. 54-2 at 1-2.) Koehler forwarded the email to Cushing and non-defendant William Swiekatowski, asking, "SPN[1] review?" (*Id.*) Cushing responded, and included Kind, asking if they just

---
[1] SPN means Special Needs Placement (ECF No. 50, ¶ 58.)

4

wanted to separate them by housing unit using a special handling note, which is a note in Perkins's Wisconsin Integrated Corrections Systems (WICS) profile indicating he needed to be kept separate from Behrensrung. (*Id.*, ECF No. 50, ¶ 59.)

Ultimately, it was agreed that placing a special handling note was the most efficient option. (ECF No. 50, ¶ 59.) On February 7, 2022, Koehler submitted a special handling note to be placed in Perkins's WICS profile stating that Perkins and Behrensprung "had a suspected inappropriate relationship" and they should be separated by housing unit. (ECF No. 50, ¶ 61.) Kind approved of this special handling note. (*Id.*, ¶ 62.) The defendants assert that the special handling note was placed in Perkins's WICS profile because his suspected relationship with Behrensprung violated the Wisconsin Department of Corrections Policy that prohibits sexual relationships in custody, even if the relationship is consensual. (*Id.*, ¶¶ 41-46.) A suspected relationship poses a safety and security threat, and the special handling note was placed in Perkins's profile to address that threat. (*Id.*, ¶ 67.)

Perkins asserts that the special handling note was placed in his profile in retaliation for "forcing a PREA investigation on behalf of Behrensprung." (ECF No. 62 at 1.) He states that the special handling note was a form of targeting and harassment and purposely used to label Perkins as "gay." (*Id.*) Perkins contends that Kazik and the defendants intentionally misconstrued emails which Perkins had sent to his wife as statements about a relationship with Behrensprung, and that if there were any warm feelings expressed to Behrensprung it was because Behrensprung was like a brother to him. (ECF No. 61 at 2.)

5

Perkins also points to a letter from Warden Dylon Radtke to Behrensprung dated October 18, 2020, wherein Radtke stated that, in Radtke's prior correspondence to Behrensprung, he had "incorrectly stated that there was nothing in WICS stating a 'keep separate' notation between you and Mr. Perkins. I have verified that the 'keep separate by unit' notation remains in WICS based on the prior events at [Oshkosh]." (ECF No. 61-1 at 1.) Perkins asserts that the only "event" at Oshkosh was the PREA investigation; thus, Radtke's letter is proof that the special handling note was put in Perkins's profile because of Perkins's involvement in the PREA investigation. (ECF No. 73 at 4.) The defendants note that the discussion regarding the placement of the special handling note did not mention the PREA investigation, and Kazik also made no mention of it. (ECF No. 50, ¶¶ 64-66.) Additionally, they state that Radtke's letter does not mention the PREA investigation. (ECF No. 72 at 3.)

*Cushing's Alleged Verbal Harassment*

According to Cushing, on April 28, 2022, while he was in the North Cell Hall, Perkins approached him and asked if he could share a cell with Behrensprung. (ECF No. 50, ¶ 72.) Cushing told Perkins that, because of the special handling note, Perkins and Behrensprung were required to be in separate housing units because they were suspected of being in an inappropriate relationship. (*Id.*, ¶ 75.)

Perkins denies requesting to be housed with Behrensprung, and instead asserts that Cushing quoted from the PREA report; purposely called him "gay"; and yelled it so that other prisoners would hear. (ECF No. 61 at 6.) According to Perkins, Cushing was aware that, if he called Perkins "gay" in front of other prisoners, it would cause

6

other prisoners to target and harass Perkins. (*Id.* at 18.) Cushing denies calling Perkins "gay" or saying that Perkins was trying to have sex with Behrensprung. (ECF No. 50, ¶ 76.) Cushing admits that another prisoner was in the area where he and Perkins were having this conversation (*Id.*, ¶ 77.) Cushing also states that he did not have access to the PREA report, so he could not possibly have quoted from it. (*Id.*, ¶ 78.)

Perkins states that, as a result of this encounter, Cushing issued him a retaliatory and harassing conduct report that resulted in him getting sent to segregation. (ECF No. 61 at 18.) Cushing admits that on May 10, 2022, he issued Perkins a conduct report but states that it was for notes Perkins sent to a social worker purporting to be from Behrensprung. (ECF No. 50, ¶¶ 81-85.) As such, Cushing charged Perkins with counterfeiting and forgery and lying. (*Id.*, ¶ 88.) On May 31, 2022, Perkins had a major disciplinary hearing at which he was found guilty of counterfeiting, forgery, and lying, and was sentenced to 90 days in segregation. (*Id.*, ¶ 89.) Perkins served 68 days. (*Id.*, ¶ 90.)

Perkins also states that, because of Cushing's verbal harassment, he was "stalked" by another prisoner, who asked him if he was gay and made suggestive gestures towards him. (ECF No. 61 at 15; ECF No. 73 at 7.) Further, his time in segregation, coupled with the fear of being attacked because staff and other prisoners thought he was gay, caused his depression to worsen. (ECF No. 61 at 14.) Perkins had to go off his anti-depressant medication so he could "defend himself." (*Id.* at 19.) He states that his depression got so bad that on June 22, 2023, he attempted to hang

7

himself. (*Id.*) He also states that, as a result of Cushing labelling him gay and targeting him, he lost out on a "runner job" because Koelher would not hire him. (*Id.* at 16.)

The defendants assert that Perkins has had a long history of depression and incidents of self-harm. (ECF No. 50, ¶ 92.) While they admit that Perkins did report that he was depressed because other prisoners and staff thought he was gay or bisexual, he did not follow up with the Health Services Unit's recommendation that he see a psychiatrist to address these issues. (*Id.*, ¶¶ 94-96.) The defendants also note that Perkins's mental health classification has not escalated or otherwise changed since being transferred to GBCI. (*Id.*, ¶ 97.) The defendants state that Perkins was denied the runner job because Perkins was simply attempting to gain access to Behrensprung; the denial was a security decision. (ECF No. 72 at 5-6.)

It is undisputed that Perkins has not been physically attacked since Cushing's alleged verbal harassment. (ECF No. 50, ¶ 108.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the

8

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Perkins claims that the defendants violated his First Amendment rights when they retaliated against him for reporting a PREA violation on Behrensprung's behalf. He also claims that Cushing violated his Eighth Amendment rights by verbally harassing him.

9

*First Amendment Retaliation Claim*

To demonstrate retaliation, a plaintiff must prove that "(1) [the plaintiff] engaged in an activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff makes this prima facie showing, the defendants must show that the adverse action would have occurred anyway. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). In other words, if the plaintiff demonstrates all three initial elements of a retaliation claim, the burden of proof shifts to the defendants to show that they would have taken the same actions "even in the absence of protected conduct." *Green v. Dourff*, 660 F.3d 975, 979 (7th Cir. 2011). If the defendants can make this showing, then the plaintiff must demonstrate that the defendants' proffered reason was pretextual and that the real reason was retaliatory animus. *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

The defendants do not dispute that reporting a PREA violation is an activity protected by the First Amendment. (ECF No. 49 at 12.) They do, however, argue that Perkins has not demonstrated that he suffered a deprivation or that reporting a PREA violation motivated the defendants. Perkins alleges that he suffered a deprivation because the defendants placed a special handling note in his WICS profile specifying housing restrictions.

The defendants state that, by law, this cannot constitute a deprivation because Perkins has no constitutional right to a particular housing situation. However, the

10

Seventh Circuit Court of Appeals has held that a retaliation claim has merit where the plaintiff alleges that "the defendants punished him for exercising his First Amendment rights, and whether he enjoyed a liberty or property interest in the privilege at issue is irrelevant." *Cunningham v. O'Leary*, 40 Fed. App'x 232, 235 (7th Cir. 2002). This includes cell assignments *Id.* And, finally, taking the facts in the light most favorable to him, Perkins has demonstrated that the special handling note was placed in his profile as punishment for Perkins reporting a PREA violation.

The burden, then, shifts to the defendants to show that they would have placed the special handling note regardless of Perkins reporting the PREA violation while at Oshkosh. The defendants assert that they placed the special handling note in Perkins's WICS profile because they had reason to believe he was in a prohibited relationship with Behrensprung. Thus, for security reasons, they needed to be housed separately. As proof that security was the motive behind placing the special handling note, they offer the email chain between Kazik, the GBCI security staff, and the defendants, which contains no mention of the PREA investigation.

Perkins argues that this explanation is pretextual because Kazik misunderstood the emails between Perkins and his wife and Behrensprung. However, the emails suggest that there could have been a romantic relationship between Perkins and Behrensprung, (*See* ECF No. 55-1). What matters, for the purposes of retaliation analysis, is Kazik's motivation, which was his suspicion of an impermissible relationship, and whether his interpretation of the emails was the reason the special handling note was placed in Perkins' profile. Because Kazik's interpretation of the

11

emails the reason for the special handling note, the fact that Perkins may not have actually had a sexual or romantic relationship with Behrensprung does not demonstrate that the defendants' stated motivation was pretextual.

Nor does the October 18, 2020, letter from Warden Radtke demonstrate that the defendants' reason for placing the special handling note in Perkins's WICS profile was pretextual. Perkins makes much of the fact that Radtke stated that the separate notation was put into place because of "events at Oshkosh". (ECF No. 61-1 at 1.) He argues that the only "event" at Oshkosh was the PREA investigation. However, there is no evidence of what Radtke was referring to when he referred to "events at Oshkosh" other than Perkins's speculation that he must have been referring to the PREA investigation. While a non-movant "is entitled . . . to all reasonable inferences in [his] favor, inferences that are supported by only speculation and conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packing Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014). Absent any evidence that the defendants placed the special handling note in Perkins's file in retaliation for the "events at Oshkosh," no reasonable factfinder could conclude that the defendants' reasons for placing the special holding note was pretextual.

As such, the court grants the defendants summary judgment on the First Amendment retaliation claim. The claim is dismissed. Because there are no remaining claims against Koehler and Kind, they are also dismissed.

12

*Eighth Amendment Verbal Harassment Claim*

"The Eighth Amendment prohibits cruel and unusual punishments that involve the unnecessary and wanton infliction of pain." *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019). This includes "acts 'totally without penological justification.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 737 (2002)). "Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest, or deny a prisoner equal protection of the laws." *Dewalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). And whether "[s]imple or complex, most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015).

However, "some does," depending on the context. *Beal,* 803 F.3d at 358. Cases from the Seventh Circuit demonstrate that, where the verbal harassment inflicts either physical or psychological pain, takes advantage of a vulnerability, is "not fleeting" or not "too limited to have an impact" but instead is significant or reoccurring, and/or the official is "uniquely situated" to aggravate or cause pain to the prisoner, it can rise to the level of a constitutional violation. *See Beal*, 803 F.3d at 358-59; *Lisle*, 933 F.3d at 718-19. This list is not a closed list and, depending upon the facts of a case, other situations may create unconstitutional conditions. *Id.*

The question here is whether Cushing's comments and actions rise to the level of an Eighth Amendment violation. Taking the facts in the light most favorable to Perkins, when Perkins was talking with Cushing on April 28, 2022, within earshot of other prisoners, Cushing read from the PREA report and called Perkins "gay". As a

13

result, another inmate propositioned Perkins. Also, his time in segregation (which Perkins states was in retaliation for complaining about this incident[2]), coupled with his fear of being attacked for his perceived sexuality, caused his depression to worsen. He states he tried to hang himself a year later because of his depression. He also states that he missed out on a job opportunity.

However, the undisputed record also shows that Perkins has an extensive history with depression, self-harm, and other mental health issues. Perkins also did not follow up with the Health Services Unit or the Psychological Services Unit to address any changes in his mental health treatment. Indeed, his mental health classification has not changed since being transferred to GBCI.

The Seventh Circuit has stressed that, where the verbal harassment is "too limited to have an impact," it is not a constitutional violation. *Beal*, 803 F.3d at 358. In *Lisle*, the Seventh Circuit expanded on its analysis in *Beal*, explaining that the verbal comments have to cause either extreme physical or psychological pain, usually in the context where a prison official exploits a known vulnerability with the sole purpose of exacting "psychological anguish," *Lisle*, 933 F.3d at 718-19. However, the Seventh Circuit has also acknowledged that comments that "labeled [a plaintiff] homosexual . . . increased the likelihood of sexual assaults on him by other inmates." *Beal*, 803 F.3d at 358; *Lisle*, 933 F.3d at 718.

---

[2] Perkins was not allowed to proceed on a retaliation claim or a Fourteenth Amendment due process claim based on these facts, so the court will not address any arguments related to those potential claims. *See Werner v. Hamblin*, Case No. 12-C-0096, 2013 WL 788076 at *2 (E.D. Wis. March 1, 2013).

14

Using *Beal* as a guide, even when taking the facts in a light most favorable to Perkins, Cushing's comments do not rise to the level of a constitutional violation. While Perkins anxiety and depression increased, unlike the plaintiff in *Beal*, it is undisputed that he did not require any additional mental health care. And given Perkins's history of self-harm, a suicide attempt a year later cannot, on its own, demonstrate a harm proximately caused by Cushing's comments. Also, the defendant's actions in *Beal* occurred more than once and were more severe than simply calling the plaintiff "gay." In *Beal*, the defendant repeatedly made references to his own penis, urinated in front of the plaintiff while smiling, and also told the plaintiff to put his "wiener" in another prisoner's mouth in front of other prisoners. *Id.* Additionally, after these incidents, the plaintiff in *Beal* was routinely harassed by other prisoners who called him names such as "punk, fag, sissy, and queer". *Id.*

Perkins, on the other hand, had only one isolated awkward encounter with another prisoner. On balance, no reasonable jury could conclude that Cushing's comments were so egregious that they rise to the level of cruel and unusual punishment. Summary judgment is granted in Cushing's favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted as to all claims. The defendants also argued that they were entitled to qualified immunity, but because the court granted summary judgment in their favor

15

on the merits, it does not need to address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' amended motion for summary judgment (ECF No. 48) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 1st day of February, 2024.

BY THE COURT

_William E. Duffin_
WILLIAM E. DUFFIN
United States Magistrate Judge